## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| ANA PAULA MONTEIRO,<br><br>Plaintiff,<br><br>v.<br><br>HIRERIGHT, LLC,<br><br>Defendant. | Case No.: 1:23-cv-00353 |

## COMPLAINT AND DEMAND FOR JURY TRIAL

Ana Paula Monteiro ("Plaintiff" or "Ms. Monteiro"), by and through her counsel brings the following Complaint against HireRight, LLC ("Defendant" or "HireRight") for violations of the federal Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §§ 1681, *et seq.*, arising out of an employment background check report that Defendant published to Plaintiff's employer, which inaccurately portrayed a criminal record with a disposition of *pending* rather than ***dismissed***.

## INTRODUCTION

1. This is an individual action for damages, costs, and attorney's fees brought against Defendant pursuant to the Fair Credit Reporting Act, 15 U.S.C. §§ 1681, *et seq.* ("FCRA").

2. Defendant is a consumer reporting agency that compiles and maintains files on consumers on a nationwide basis. It sells consumer reports generated from its database and furnishes these consumer reports to employers who use the reports to make decisions regarding whether to offer employment to certain consumers.

3. Defendant falsely reported to Plaintiff's employer that Plaintiff had a criminal case pending against her. Defendant's reporting is grossly inaccurate and untrue.

4. Plaintiff had no criminal cases pending against her.

1

5. Plaintiff's employer suspended Plaintiff's employment after receiving an employment background check report from Defendant, which included the inaccurate information that Plaintiff had a criminal case pending against her.

6. Defendant's inaccurate reporting could have easily been avoided had Defendant performed a cursory review of the widely available underlying public court records from Providence County, Rhode Island regarding the disposition of the criminal record prior to publishing Plaintiff's report to her employer.

7. Had Defendant performed even a cursory review of the underlying public court records, it would have discovered that Plaintiff did not have a criminal case pending against her. Rather, the case against Plaintiff had been dismissed on August 20, 2019.

8. Defendant does not employ reasonable procedures to assure the maximum possible accuracy of the information it reports regarding consumers. Defendant's failure to employ reasonable procedures resulted in Plaintiff's report being grossly inaccurate.

9. Defendant committed these violations pursuant to its standard policies and practices, which harm innocent consumers seeking employment by prejudicing their current and prospective employers with inaccurate criminal record information.

10. Defendant's inaccurate report cost Plaintiff multiple opportunities to earn income on the Uber platform during the period in which she was suspended.

11. As a result of Defendant's violations of the FCRA, Plaintiff has suffered a range of actual damages including, without limitation, loss of employment opportunities, wages, and benefits; loss of economic opportunities and positions and advancements in the future; loss of time and money trying to correct her background check report; the expenditure of labor and effort disputing and trying to correct the inaccurate reporting; damage to her reputation; loss of sleep;

lasting psychological damage; loss of capacity for enjoyment of life; and emotional distress, including mental anguish, anxiety, fear, frustration, humiliation, and embarrassment.

12. As a result of Defendant's conduct, action, and inaction, Plaintiff brings claims against Defendant for failing to follow reasonable procedures to assure maximum possible accuracy based on 15 U.S.C. § 1681e(b) of the FCRA.

## PARTIES

13. Plaintiff, Ana Paula Monteiro, is a natural person residing in Providence, Rhode Island, and is a "consumer" as that term is defined in 15 U.S.C. § 1681a(c).

14. Defendant HireRight, LLC ("Defendant" or "HireRight") is a Delaware corporation doing business throughout the United States, including the State of Rhode Island and in this District, and has a principal place of business located at 100 Centerview Dr, Suite 300, Nashville, TN 37214.

15. Among other things, Defendant sells background checks to employers for their use in deciding whether to offer employment to prospective employees or to take adverse action such as termination, failure to hire, or failure to promote. These reports are provided in connection with a business transaction initiated by the employer.

16. Defendant is a consumer reporting agency as defined in 15 U.S.C. § 1681a(f) because for monetary fees, it regularly engages in the practice of evaluating and/or assembling information on consumers for the purpose of furnishing consumer reports for employment purposes to third parties, and uses interstate commerce, including the Internet, for the purpose of preparing and furnishing such consumer reports.

## JURISDICTION AND VENUE

17. This Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 1681p, which allows claims under the FCRA to be brought in any appropriate court of competent jurisdiction.

18. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

## STATUTORY BACKGROUND

19. Enacted in 1970, the FCRA's passage was driven in part by two related concerns: first, that consumer reports were playing a central role in people's lives at crucial moments, such as when they applied for a job or credit, and when they applied for housing. Second, despite their importance, consumer reports were unregulated and had widespread errors and inaccuracies.

20. While recognizing that consumer reports play an important role in the economy, Congress wanted consumer reports to be "fair and equitable to the consumer" and to ensure "the confidentiality, accuracy, relevancy, and proper utilization" of consumer reports. 15 U.S.C. § 1681.

21. Congress, concerned about inaccuracies in consumer reports, specifically required consumer reporting agencies to follow "reasonable procedures to assure maximum possible accuracy" in consumer reports. 15 U.S.C. § 1681e(b).

22. Consumer reports that contain factually incorrect information which does not belong to the consumer at issue are neither maximally accurate nor fair to the consumers who are the subjects of such reports.

## THE FCRA'S PROTECTIONS FOR JOB APPLICANTS

23. Despite its name, the Fair Credit Reporting Act covers more than just credit reporting, it also regulates employment background check reports like the one Defendant prepared in Plaintiff's name.

24. The FCRA provides a number of protections for job applicants who are the subject of background checks for purposes of securing employment, housing, and other purposes.

25. In the parlance of the FCRA, background checks are "consumer reports," and providers of background checks, like Defendant, are "consumer reporting agencies." 15 U.S.C. §§ 1681a(d) and (f).

26. The FCRA imposes duties on consumer reporting agencies to assure that consumer reports are accurate and that "consumer reporting agencies exercise their grave responsibilities with fairness, impartiality, and a respect for the consumer's right to privacy." 15 U.S.C. § 1681.

27. Under 15 U.S.C. § 1681e(b), consumer reporting agencies are required "to follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates."

28. Defendant disregarded its duties under the FCRA with respect to Plaintiff's background check report.

## DEFENDANT'S ILLEGAL BUSINESS PRACTICES

29. Over the past 15 years, there has been increased collection and aggregation of consumer data, including criminal records and sex offender registration data. As a result of the increasing availability of this data, there has been a boom in the background check industry.

30. As summarized in a recent report by the Consumer Financial Protection Bureau[1], a 2018 survey of employers found that 95 percent of employers surveyed conducted one or more types of background screening. CFPB Report at 4.

31. The criminal background check industry takes in revenues in excess of three billion dollars, annually.[2]

32. Criminal background checks are generally created by running automated searches through giant databases of aggregated criminal record data. The reports are created and disseminated with little to no manual, in-person review, and the underlying court records are rarely directly reviewed in creating criminal background checks.

33. Background check companies, like Defendant, collect millions of criminal records from a number of sources with data from county, state, and federal level sources. The data included on the reports is often not obtained directly from court records on an individual basis but instead is purchased in bulk or scraped from court websites.

34. Given that Defendant is in the business of selling background checks, Defendant should be well aware of the FCRA and the attendant harm to consumers for reporting inaccurate or outdated information.

35. Defendant places its business interests above the rights of consumers and reports such inaccurate information because it is cheaper for Defendant to produce reports containing information that is inaccurate and incomplete than it is for Defendant to exert proper quality control over the reports prior to their being provided to Defendant's customers.

---

[1] CFPB, *Market Snapshot: Background Screening Reports* (Oct. 2019), https://files.consumerfinance.gov/f/documents/201909_cfpb_market-snapshot-background-screening_report.pdf ("CFPB Report").
[2] IBISWorld, Inc., *Background Check Services in the US: Report Snapshot*, available at http://www.ibisworld.com/industry/background-check-services.html.

36. Defendant reports such erroneous and incomplete information because it wants to maximize the automation of its report creation process, thereby saving the costs associated with conducting the additional review necessary to remove the inaccurate or out-of-date entries.

37. Defendant charges its customers the same price for reports that are grossly inaccurate as it does for accurate reports.

38. Appropriate quality control review of Plaintiff's report would have made clear that Defendant was inaccurately reporting the disposition of the criminal record as pending despite the fact that it had been dismissed several years prior to the issuance of the report.

39. As a provider of background check reports, Defendant should be aware of the FCRA requirements and is likely a member of the Professional Background Screening Association ("PBSA"). PBSA hosts a conference at least once a year where presenters discuss compliance with federal and state consumer reporting laws.

## FACTS

**A.  Plaintiff's Uber Employment**

40. Plaintiff has been working on and off for Uber for years. Since approximately July 2022, Plaintiff has been working for Uber full-time and earns the entirety of her income therefrom.

41. Aside from her Uber income, Plaintiff has no other steady source of income, and Plaintiff wholly relied on her Uber income to financially survive.

42. Because Plaintiff was thoroughly reliant on financially sustaining herself via income from her Uber driving, and because she anticipated working for Uber for years to come, Plaintiff determined that it would be financially beneficial to her to finance the purchase of a vehicle, rather than rent a vehicle from Uber.

43. As such, Plaintiff financed the purchase of a vehicle, which she used for her Uber driving.

44. Plaintiff's employment with Uber has been and is, on an ongoing basis, subject to Plaintiff passing a background check ("employment report.")

45. Up until August 2023, Plaintiff had not previously experienced a disruption in her employment for Uber due to the results of a background check, despite numerous background checks having been conducted about her on behalf of Uber.

**B.  Defendant Published an Inaccurate Background Check Report to Uber**

46. Uber contracted with Defendant to conduct periodical background checks, including criminal background checks, on its employees.

47. Upon information and belief, Uber conducts annual background checks on its employees.

48. Accordingly, on or about July 5, 2023, Uber ordered a routine criminal background check on Plaintiff from Defendant.

49. On or about August 1, 2023, in accordance with its standard procedures, Defendant completed its employment report about Plaintiff and sold the same to Uber.

50. Within that employment report, Defendant published inaccurate information about Plaintiff.

51. Specifically, Defendant's employment report about Plaintiff included grossly inaccurate and stigmatizing information from Providence County, Rhode Island, that occurred during a minor dispute with her sister, which appeared in the employment report as follows:



52. The "pending" disposition of the criminal case reported by Defendant about Plaintiff was inaccurate.

53. At the time of Defendant's report about Plaintiff to Uber, there were no pending criminal charges against Plaintiff.

54. Case Number P2-2019-2891ADV (the "Domestic Charge") was dismissed in August 2019, *several years prior* to Defendant issuing the report about Plaintiff to Uber in August 2023.

55. A cursory review of the widely available underlying public court records confirms that the Domestic Charge was not pending at the time of Defendant's report in August 2023. Moreover, Case Number P2-2019-2891ADV had been dismissed on August 20, 2019

56. The sole reason the inaccurate disposition of the criminal charge was reported is that Defendant failed to follow reasonable procedures to assure the maximum possible accuracy of the information it published within the employment report it sold about Plaintiff to Plaintiff's employer.

57. Had Defendant followed reasonable procedures, it would have discovered that Plaintiff did not have pending charges against her and that it should not have reported the same.

58. In preparing and selling a consumer report about Plaintiff, wherein Defendant published to Plaintiff's employer inaccurate information about Plaintiff, Defendant failed to follow reasonable procedures to assure that the report was as accurate as maximally possible, in violation of 15 U.S.C. § 1681e(b).

**C.   Uber Suspends Plaintiff's Employment**

59. On or about August 2, 2023, Plaintiff attempted to log into her Uber account to begin work for the day and discovered that her access was suspended. An Uber app notification informed her that there was an issue with her background check report.

60. On or about August 2, 2023, Plaintiff received a Pre-Adverse Action Notice email from Uber which stated that information contained in the Defendant's report may disqualify

Plaintiff from being eligible to continue to work for Uber and therefore her employment was suspended.

61. Uber's Pre-Adverse Action Notice email was clear that "[t]he specific records that may disqualify you from eligibility to use the Uber app are: Charge - 2019-06-05, Domestic Violence – Unlawful Breaking/Entering Dwelling House - 1St Offense, **Pending**, FELONY (OR EQUIVALENT)" (emphasis added).

62. Shortly thereafter, Plaintiff obtained a copy of the subject employment report and was shocked upon reviewing the inaccurate status of Case Number P2-2019-2891ADV with a disposition of "pending" rather than dismissed contained within the subject employment report.

63. Plaintiff was very panicked, confused, and concerned about the impact of the inaccurate reporting of Case Number P2-2019-2891ADV, both in relation to the Uber, but also the impact of the same on her future.

64. Specifically, Defendant had reported Case Number P2-2019-2891ADV with a disposition of pending rather than dismissed. The underlying court records were available to Defendant prior to publishing Plaintiff's employment report to Uber, but Defendant failed to obtain, or perform even a cursory review of, such information.

65. Plaintiff pays her own rent and is financially completely self-sufficient and independent. Thus, the loss of the opportunity to earn Uber income had the potential to be devastating for her, financially, mentally, emotionally, and otherwise.

66. Plaintiff was extremely anxious to get back to work.

**D.    Plaintiff Disputed the Misinformation in Defendant's Employment Report**

67. On or about August 2, 2023, desperate to resume her employment for Uber and worried about her ability to make car payments without income and riddled with worry over the

far-reaching impacts of the inaccurate information, Plaintiff disputed the inaccurate information with Defendant online, and provided to Defendant, as well, a copy of the public record demonstrating that the Domestic Charge had been dismissed years prior."

68. In Plaintiff's online dispute, Plaintiff identified herself and provided information to Defendant to support her dispute.

69. Plaintiff specifically disputed the inaccurate reporting of any criminal record with a disposition of pending that should have been reported as dismissed.

70. Plaintiff specifically asked Defendant to investigate and correct its reporting in any employment report about Plaintiff.

71. Thereafter on the same date, Plaintiff called Defendant by phone to follow up on her dispute. She spoke with several individuals and was on the phone for over two hours, during which time Defendant maintained a refusal to commit to correcting her employment report.

72. Instead, Defendant opened a dispute "ticket" (Ticket No. 13385064).

73. On or about August 8, 2023, Plaintiff received an email from Defendant stating that her dispute reinvestigation was complete and that she should receive her dispute result and an updated report.

74. Plaintiff anxiously awaited receipt of a corrected employment report, but such a report did not arrive.

75. Accordingly, on the same date, Plaintiff filed a complaint with Better Business Bureau.

76. On or about August 9, 2023, Plaintiff informed Defendant that she filed a complaint with Better Business Bureau concerning its erroneous reporting that cost her to be unable to access her sole source of reliable income, and that she still never received a dispute response.

77. On or about August 9, 2023, Plaintiff received Uber's correspondence confirming that her account was reactivated.

78. On or about August 10, 2023, Plaintiff received Defendant's correspondence confirming that Defendant had reinvestigated Plaintiff's dispute and conceded its inaccurate reporting by correcting the reporting.

79. To this day, Plaintiff still awaits receipt of a copy of an updated and/or corrected HireRight employment report, which she was promised.

80. Defendant's false report cost Plaintiff valuable opportunities to drive for Uber and earn income from August 2, 2023, to August 9, 2023.

81. Due to Defendant's unreasonable procedures in the first place, Plaintiff has been unable to work from August 2, 2023, to August 9, 2023.

82. Plaintiff would have earned approximately an estimated $600 dollars during the time-period during which she was unwillingly suspended from Uber due to Defendant's actions.

83. Due to the loss of income, Plaintiff had trouble keeping up with her car payments.

84. Further, Plaintiff had trouble sleeping due to her considerable worry, anxiety, and distress caused by Defendant, such as with respect to when and whether HireRight would correct its error, when and whether Uber would reactivate her account, and when and whether she would be able to keep up with her financial obligations.

85. The loss of income had devastating consequences for her normal life and negatively affected the ability to pay her bills.

86. The injuries suffered by Plaintiff as a direct result of Defendant's erroneous reporting are the type of injuries that the FCRA was enacted to address. Under common law,

Defendant's conduct would have given rise to causes of action based on defamation and invasion of privacy.

87. As a result of Defendant's violations of the FCRA, Plaintiff has suffered a range of actual damages including, without limitation, loss of employment opportunities, wages, and benefits; loss of economic opportunities and positions and advancements in the future; loss of time and money trying to correct her background check report; the expenditure of labor and effort disputing and trying to correct the inaccurate reporting; damage to her reputation; loss of sleep; lasting psychological damage; loss of capacity for enjoyment of life; and emotional distress, including mental anguish, anxiety, fear, frustration, humiliation, and embarrassment.

## CLAIMS FOR RELIEF

### COUNT I
### 15 U.S.C. § 1681e(b)
### Failure to Follow Reasonable Procedures to Assure Maximum Possible Accuracy

88. Plaintiff re-alleges and incorporates by reference the allegations set forth in the preceding paragraphs as if fully stated herein.

89. Defendant is a "consumer reporting agency" as defined by 15 U.S.C. § 1681a(f).

90. At all times pertinent hereto, Plaintiff was a "consumer" as that term is defined by 15 U.S.C. § 1681a(c).

91. At all times pertinent hereto, the above-mentioned employment report was a "consumer report" as that term is defined by 15 U.S.C. § 1681a(d).

92. Defendant violated 15 U.S.C. § 1681e(b) by failing to establish or to "follow reasonable procedures to assure maximum possible accuracy" in the preparation of the employment report it sold about Plaintiff as well as the information it published within the same.

93. As a result of Defendant's violations of the FCRA, Plaintiff has suffered a range of actual damages including, without limitation, loss of employment opportunities, wages, and benefits; loss of economic opportunities and positions and advancements in the future; loss of time and money trying to correct her background check report; the expenditure of labor and effort disputing and trying to correct the inaccurate reporting; damage to her reputation; loss of sleep; lasting psychological damage; loss of capacity for enjoyment of life; and emotional distress, including mental anguish, anxiety, fear, frustration, humiliation, and embarrassment.

94. Defendant willfully violated 15 U.S.C. § 1681e(b) in that its conduct, actions, and inactions were willful, rendering them liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. Alternatively, they were negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

95. Plaintiff is entitled to recover statutory damages, punitive damages, and reasonable attorneys' fees and costs from Defendant in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for the following relief:

a) Determining that Defendant negligently and/or willfully violated the FCRA;

b) Awarding Plaintiff actual, statutory, and punitive damages as provided by the FCRA;

c) Awarding Plaintiff reasonable attorneys' fees and costs as provided by the FCRA; and,

d) Granting further relief, in law or equity, as this Court may deem appropriate and just.

## **DEMAND FOR JURY TRIAL**

Plaintiff is entitled to and hereby demands a trial by jury on all issues so triable.

Dated: August 30, 2023              */s/ Matthew McKenna*
                                    Matthew McKenna, Esq., #10320
                                    **SHIELD LAW, LLC**
                                    157 Belmont Street
                                    Brockton, MA 02301
                                    T: (508) 588-7300
                                    F: (508) 588-7303
                                    E: matt@shieldlaw.com

                                    *Attorneys for Plaintiff Ana Paula Monteiro*